1   MENNEMEIER, GLASSMAN & STROUD LLP
    KENNETH C. MENNEMEIER (SBN 113973)
2   LANDON D. BAILEY (SBN 240236)
    980 9th Street, Suite 1700
3   Sacramento, CA 95814-2736
    Telephone:  916-553-4000
4   Facsimile:  916-553-4011

5   Attorneys for Plaintiff
    Transcription Communications Corporation

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  TRANSCRIPTION COMMUNICATIONS      )   Case No. 08-CV-04418 TEH
    CORPORATION, a California corporation, )
13                                     )   **PLAINTIFF TRANSCRIPTION**
                      Plaintiff,       )   **COMMUNICATIONS CORPORATIONS'**
14                                     )   **OPPOSITION TO JOHN MUIR HEALTH'S**
    v.                                 )   **MOTION TO DISMISS PLAINTIFF'S**
15                                     )   **FIRST AMENDED COMPLAINT**
    JOHN MUIR HEALTH, dba JOHN MUIR    )
16  MEDICAL CENTER and MOUNT           )   Date:          December 8, 2008
    DIABLO MEDICAL CENTER, a California )  Time:          10:00 a.m.
17  corporation; FOCUS ENTERPRISES     )
    LIMITED, dba FOCUS INFOMATICS,     )   Judge:         Hon Thelton E. Henderson
18  INC., a Delaware corporation;      )   Courtroom:     12
    eSCRIPTION, INC., a Delaware       )
19  corporation; NUANCE               )   Complaint Filed: July 7, 2008
    COMMUNICATIONS, INC., a Delaware   )   Removal Filed:  September 22, 2008
20  corporation; and DOES 1-10, inclusive, )  Trial Date:     TBD
                                       )
21                    Defendants.      )
                                       )
22

23

24

25

26

27

28

471.01.PLE.oppo.jmh.mot.dismiss.COVER.wpd
PLAINTIFF'S OPPO. TO JMH'S MOTION TO DISMISS FIRST AMENDED COMPLAINT – 08-CV-04418 TEH

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Origin of TCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B. The Services Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C. TCC's Expansion and Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D. The January 2003 Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E. The November 2003 Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    F. JMH "Terminates" the Services Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    G. JMH's New Vendor Outsources TCC's Transcription Work Overseas . . . . . . . . . . . 5

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. TCC's Factual Allegations Properly State a Claim for Breach of Contract
       Against JMH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1. Applicable Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2. TCC Alleges Every Element of Breach of Contract . . . . . . . . . . . . . . . . . . . 6

    B. The Services Agreements Cannot Be Terminated Without Cause . . . . . . . . . . . . . . . 6

        1. The 90 Day Notice Provision is Silent on The Issue of Acceptable
           Cause for Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           a. California Law Treats "Termination Upon Notice" Contract
              Provisions as Silent on Acceptable Termination Grounds . . . . . . . . . 8

           b. The 90 Day Notice Provisions' Good Cause Requirement is
              Not Negated by Other Provisions of the Services Agreements . . . . . . . 9

        2. The Services Agreements, as Appropriately Interpreted, Require
           Good Cause for Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           a. The Services Agreements Set Forth Firm Expiration Dates . . . . . . . . 11

           b. The January 2003 Addendum Expressly Extends the Services
              Agreements Through December 31, 2007 . . . . . . . . . . . . . . . . . . . . 12

           c. The Circumstances Surrounding Formation of the Services
              Agreements and Addenda Confirm That the 90 Day Notice
              Provision Only Permits Termination For Good Cause . . . . . . . . . . . 13

**TABLE OF CONTENTS (con't)**

d.   The Parties' Conduct in Performing the Services Agreements Evidences Their Understanding of its Firm Termination Dates . . . . . 13

3.   Extrinsic Evidence of the Parties' Intent Must be Admitted, if Necessary, to Show That the Services Agreements Required Good Cause for Early Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

a.   The Services Agreements are Incomplete and Only Partially Integrated, and Extrinsic Evidence Must Be Permitted to Present the Complete Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

b.   The Understanding Between JMH and TCC Concerning Acceptable Cause for Termination is One Which Might Naturally Be Made Separately From the Written Instrument . . . . . . . . . . . . . . . . . . . 18

c.   The 90 Day Notice Provision is Reasonably Susceptible to Interpretation as a "For Cause" Termination Provision . . . . . . . . . . . 19

C.   JMH's Conduct Constitutes a Breach of the Implied Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1.   JMH Both Created and Frustrated TCC's Legitimate Expectations of a Sustainable, Lasting Business Opportunity . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2.   JMH Forced TCC to Compete For Its Own Contract, But Did Not Allow TCC To Compete Fairly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.   JMH Cannot Escape Responsibility For Its Bad Faith Conduct By Reference To The 90 Day Notice Provision . . . . . . . . . . . . . . . . . . . . . 23

D.   Leave to Amend Should Be Granted to Correct Pleading Deficiencies, If Any . . . . . 24

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## STATE CASES

*Brawthen v. H & R Block, Inc.*,
  28 Cal.App.3d 131 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*CDF Firefighters v. Maldonado*,
  158 Cal.App.4th 1226 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Crestview Cemetery Association v. Dieden*,
  54 Cal.2d 744 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Dore v. Arnold Worldwide, Inc.*,
  39 Cal.4th 384 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Esbensen v. Userware International, Inc.*,
  11 Cal.App.4th 631 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Goodman v. Severin*,
  274 Cal.App.2d 885 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Lazar v. Hertz Corp.*,
  143 Cal.App.3d 128 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Locke v. Warner Brothers, Inc.*,
  57 Cal.App.4th 354 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Masterson v. Sine*,
  68 Cal.2d 222 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 20

*McLain v. Great American Insurance Cos.*,
  208 Cal.App.3d 1476 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Pac. Gas & Electric Co. v. Thomas Drayage & Rigging Co., Inc.*,
  69 Cal.2d 33 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

*Perdue v. Crocker National Bank*,
  38 Cal.3d 913 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Reichert v. General Insurance Co.*,
  68 Cal.2d 822 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rodriguez v. Barnett*,
  52 Cal.2d 154 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sunset Sec. Co. v. Coward McCann, Inc.*,
  47 Cal.2d 907 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ticor Title Insurance Co. v. Rancho Santa Fe Association*,
  177 Cal.App.3d 726 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Universal Sales Corp. v. California Press Manufacturing Co.*,
  20 Cal.2d 751 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**TABLE OF AUTHORITIES (con't)**

**STATE CASES (con't)**

*Wallis v. Superior Court,*
  160 Cal.App.3d 1109 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Walnut Creek Pipe Distributings, Inc. v. Gates Rubber Co. Sales Division, Inc.,*
  228 Cal.App.2d 810 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**FEDERAL CASES**

*Lee v. City of Los Angeles,*
  250 F.3d 668 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F.3d 940 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

*McCollum v. Xcare.net, Inc.,*
  212 F.Supp.2d 1142 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sherman v. Mutual Benefit Life Insurance Co.,*
  633 F.2d 782 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Stanford University Hospital v. Federal Insurance Co.,*
  174 F.3d 1077 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATE STATUTES**

Civil Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18
  Section 1636 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18
  Section 1641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
  Section 1647 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**FEDERAL STATUTES**

28 U.S.C.
  Section 1652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Federal Rule of Civil Procedure
  12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I.  INTRODUCTION

Less than ten years ago, Defendant John Muir Health (hereinafter "JMH") persuaded Richard Spall to create a medical transcription services company with promises of a sustainable, lasting business opportunity that would carry on so long as his company continued to satisfy JMH's transcription needs.  Spall knew and trusted JMH's representatives, and, in accordance with their requests (and relying on their promises), established Transcription Communications Corporation (hereinafter "TCC").

Shortly after TCC was created, TCC and JMH entered into two separate "Services Agreements" – one for each of the two JMH medical facilities.  The terms of the Services Agreements were substantially identical.  Each stated that TCC would be JMH's exclusive medical transcription services provider for the facility, provided for a per-line transcription rate to be adjusted annually, and set forth a specific termination date five years hence.

In January of 2003, the Services Agreements were extended, via addendum, through December 31, 2007.  TCC bargained away substantive contractual rights for this extension, believing that it would secure JMH's business for an extended period of time.

TCC consistently fulfilled its obligations under the Services Agreements, providing quality medical transcription services with a quick "turnaround time."  TCC accomplished this without the use of foreign labor, as it had agreed via another contract addendum.  JMH never had a significant complaint regarding the quality of TCC's service.

Nonetheless, nearly two years prior to the Services Agreements' extended termination date, JMH issued a solicitation for proposals from other medical transcription service companies.  JMH proceeded to hire Focus Infomatics, Inc. (hereinafter "Focus"), a company known to use and contract with foreign labor, to begin providing services in October of 2006.  JMH purported to "terminate" TCC's agreement, and stopped using TCC's services.  Having lost its only major source of revenue, TCC attempted to find other work, but ultimately was forced to lay off all of its employees and cease operations.

TCC brought this action against JMH for prematurely "terminating" the Services Agreements in bad faith and without cause, and failing thereafter to perform its express

1    obligations under those agreements. Incredibly, JMH now contends – despite its years of

2    conduct indicating otherwise – that JMH always had a right to terminate the Services Agreements

3    at any time, without cause, and even in bad faith. JMH bases this incredible assertion on its

4    flawed interpretation of a single provision of the original written Services Agreements, which

5    itself says *nothing* about acceptable cause for termination. JMH's position that the Services

6    Agreements could be terminated whenever it pleased is entirely at odds with the language of the

7    Services Agreements themselves, their addenda, the circumstances surrounding the formation of

8    the agreements, the ongoing conduct of the parties throughout the course of their relationship

9    under the Services Agreements, and the understanding that had been reached prior to the Services

10    Agreements' creation. Accordingly, JMH's motion to dismiss should be denied.

11             **II. FACTUAL AND PROCEDURAL BACKGROUND**

12       **A.**      **The Origin of TCC**

13         In December 1999, JMH representatives asked Richard Spall to create a medical

14    transcription services company for the purpose of providing one of its facilities, John Muir

15    Medical Center (hereinafter "JMMC") with medical transcription services. TCC First Amended

16    Complaint ("FAC"), ¶ 10. JMH told Spall that providing transcription services for JMH would

17    be a lasting, sustainable business opportunity that would persist so long as his company

18    performed its obligations in a satisfactory manner. FAC, ¶ 11; 18.

19         In January of 2000, Spall established and incorporated TCC for the purpose of

20    providing medical transcription services to JMMC. *Id*. at ¶ 13. From January through March of

21    2000, Spall invested substantial time, labor, and capital into developing TCC in preparation for

22    providing transcription services for JMMC. *Id*. at 15.

23       **B.**      **The Services Agreements**

24         In preliminary talks concerning the Services Agreements, JMH assured Spall that,

25    absent valid cause or justification for early termination, they would not terminate the Services

26    Agreements early. FAC, ¶¶ 11; 28. TCC and JMH understood when they entered into the

27    Services Agreements that, absent good cause for early termination, the Services Agreements

28    would remain in effect at least until their expressly delineated termination dates. *Id*. at ¶ 28.

1  Spall was comfortable with this understanding because he had a positive relationship with the

2  JMH and JMMC representatives. *Id.* at ¶ 18.   Neither of the Services Agreements contain an

3  integration clause. *See generally id.*, Ex. A; Ex. B.[1]

4         In March of 2000, TCC entered into a written agreement with JMH to become

5  JMMC's exclusive transcription service provider. *Id.* at ¶ 15.  This written agreement was the

6  first of the two Services Agreements at issue.  In July of 2000, TCC entered into a second

7  Services Agreement with JMH, by which it became the exclusive provider of medical

8  transcription services to MDMC. *Id.* at ¶ 20.

9         The terms of the two Services Agreements are substantially the same.  Both

10  originally provided for a five-year term and set forth specific termination dates. *Id.* at ¶ 26; Ex.

11  A at pg. 3, ¶ 4; Ex. B at pg. 3, ¶ 4.  Both also provided that TCC would be paid $.17 per seventy

12  character line, subject to annual cost of living adjustments. *Id.* at ¶ 25; Ex. A at pg. 3, ¶¶ 6-7; Ex.

13  B at pg. 3, ¶¶ 6-7.  Both provided that either party could terminate the Services Agreements upon

14  90 days written notice, *but without explanation as to permissible grounds for termination.  Id.* at

15  ¶ 27; Ex. A at pg. 3, ¶ 5; Ex. B at 3, ¶ 5 (hereinafter the "90 Day Notice Provision").

16         The Services Agreements also contained specific performance standards, and

17  provided notice-and-cure procedures in the event such standards were not met. *Id.*, Ex. A at pg.

18  2-3; Ex. B at pg. 2-3.  Under these procedures, if TCC failed to cure after being served with

19  proper notice, JMH had the right to terminate the Services Agreements with an additional 30

20  days written notice. *Id.*, Ex. A at pg. 3, ¶ 1; Ex. B at pg. 3, ¶ 1.

21  **C.    TCC's Expansion and Development**

22         Spall's initial investment of time, labor, and capital into TCC was substantial.

23  FAC, ¶ 14.  TCC accrued substantial debt to maintain its ability to meet JMH's transcription

24

25         [1]    This Court may properly consider the Services Agreements and addenda attached
26  to TCC's Complaint in evaluating the merits of JMH's motion to dismiss pursuant to Federal
    Rule of Evidence 12(b)(6).  While courts typically must limit consideration of a motion for
27  dismissal under Rule 12(b)(6) strictly to the allegations set forth in the complaint, it is proper to
    consider documents properly submitted as part of the complaint, as well as documents upon
28  which the complaint necessarily relies, and whose authenticity is not contested. *Lee v. City of
    Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

1    demands. *Id*. at 22. By the end of 2000, less than a year into the term of the Services

2    Agreements, TCC had invested over $50,000 in transcription software, $110,000 in computer

3    hardware, and $18,750 in office equipment. *Id*. TCC's total debt by the end of 2000 was

4    approximately $300,000. *Id*. In 2002 and 2003, TCC invested approximately $135,500 in

5    computers and peripherals, $120,000 in software, and $12,500 in office equipment. *Id*. at ¶ 33.

6    In 2004, TCC invested over $60,000 in software and computer equipment alone. *Id*. at ¶ 44.

7        **D.    The January 2003 Addendum**

8            In 2003, federal government regulations concerning the use, disclosure, and

9    security of health information pursuant to the Health Insurance Portability and Accountability

10   Act ("HIPAA") took effect. In September of 2002, TCC approached JMH representatives to

11   address issues associated with prospective compliance with those new medical record privacy

12   standards and regulations. FAC, ¶ 29. TCC estimated that complying with HIPAA would

13   require approximately $160,000 in software and equipment upgrades. *Id*. at ¶ 30.

14           TCC entered into negotiations with JMH over those new costs. *Id*. TCC initially

15   proposed a surcharge of half a cent per line for 36 months (the remaining term of the Services

16   Agreements at that time). *Id*. at ¶ 30. In response, JMH proposed a smaller per-line surcharge of

17   three-tenths of a cent per line, coupled with an extension of the Services Agreements term

18   through December 31, 2007. *Id*. at ¶ 31. TCC accepted these terms. *Id*. at ¶ 31.

19           These negotiations culminated in the execution of an "Addendum to Services

20   Agreements" dated January 31, 2003 (hereinafter the "January 2003 Addendum"). *See Id*. at ¶

21   32; Ex. C.  In the January 2003 Addendum, JMH agreed to extend the Services Agreements

22   through December 31, 2007 and pay a per-line surcharge on its medical transcription rates of

23   three-tenths of a cent per transcribed line. Id. at ¶ 32; Ex. C at ¶¶ 3-4. In exchange for this

24   extension and HIPAA-related fixed cost adjustment, TCC agreed to make the necessary

25   investments for HIPAA compliance, and to forfeit cost of living rate increases for the years 2003

26   and 2007. *Id*. at ¶ 32; Ex. C at ¶¶ 5-7. The January 2003 Addendum expressly extended "the

27   length of both agreements such that the agreements terminate on December 31, 2007." *Id*., Ex. C

28   at ¶ 3.

1    **E.    The November 2003 Addendum**

2              On or around November 3, 2003, the Services Agreements were again amended

3    by Addendum. FAC, ¶ 37; Ex. D. In this Addendum (hereinafter the "November 2003

4    Addendum") TCC agreed not to employ or contract with transcriptionists residing outside the

5    United States to fulfill its obligations under the Services Agreements. *Id*. at ¶ 37; Ex. D. TCC

6    complied with the terms of the November 2003 Addendum. *Id*. at ¶ 38.

7    **F.    JMH "Terminates" the Services Agreements**

8              TCC consistently fulfilled all of its obligations to JMH under the Services

9    Agreements, including performance of all services in a professional manner within the

10   turnaround standards set forth in the Services Agreements, as amended. FAC, ¶ 63.

11             Early in 2006, JMH issued a Request for Proposal to Provide Transcription

12   Services to John Muir Health ("RFP"). *Id*. at ¶ 53. On March 10, 2006, TCC responded to

13   JMH's RFP, reiterating its willingness to provide medical transcription services pursuant to the

14   Services Agreements, and asserting that any purported "termination" of the Services Agreements

15   prior to December 31, 2007 would be a breach of those agreements. *Id*. at ¶ 54.

16             On or around July 17, 2006, JMH gave TCC written notice of intent to terminate

17   the agreement, effective on October 24, 2006. *Id*. at ¶ 58. JMH offered no justification for

18   termination, other than its desire to use eScription "voice recognition" software, which JMH

19   thought would reduce costs. *Id*. at ¶ 60.

20   **G.    JMH's New Vendor Outsources TCC's Transcription Work Overseas**

21             JMH began using Focus, another transcription service provider, on or around

22   October 24, 2006. FAC, ¶¶ 59-61. TCC was unable to compete with the rates offered by Focus

23   because Focus used transcriptionists residing outside of the United States, thus reducing its labor

24   costs. *Id*. at ¶¶ 52; 57. The November 2003 Addendum expressly prohibited TCC from using

25   transcriptionists residing outside of the United States. *Id*. at ¶ 37; Ex. D. at ¶ 3. JMH's

26   purported "termination" of the Services Agreements deprived TCC of its primary revenue source,

27   ultimately forcing TCC to terminate all of its employees and cease business operations. *Id*. at ¶¶

28   68; 109.

### III.  ARGUMENT

**A.**    **TCC's Factual Allegations Properly State a Claim for Breach of Contract Against JMH**

**1.**    **Applicable Standard of Review**

In evaluating a defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), all facts alleged in the complaint must be accepted as true. *Lee v. City of Los Angeles*, 250 F.3d 668, 677 (9th Cir. 2001).  Courts considering a Rule 12(b)(6) motion to dismiss must construe all allegations of material fact in the light most favorable to the plaintiff. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  Dismissal pursuant to Rule 12(b)(6) "is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling plaintiff to relief." *Id.*

**2.**    **TCC Alleges Every Element of Breach of Contract**

The basic elements of breach of contract are (1) existence of a valid contractual agreement; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4) resulting damages. *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830 (1968); *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).[2]

TCC's complaint indisputably includes factual allegations establishing each element.  TCC alleges the existence of multiple valid contractual agreements and its full performance under those agreements, except where performance was prevented or excused.  FAC, ¶¶ 15; 20; 63.  TCC alleges that JMH breached the Services Agreements, and that TCC suffered damages as a result.  *Id.* at ¶¶ 65-68.  TCC has alleged each element of a breach of contract claim, and has stated a cause of action for breach of contract.

**B.**    **The Services Agreements Cannot Be Terminated Without Cause**

JMH's entire argument rests on the false premise that the Services Agreements themselves expressly permitted JMH to terminate the Services Agreements in bad faith and without any cause.  *See* Notice of Motion and Memorandum of Points and Authorities in Support

---

[2]    This Court must apply California state contract law to the state contract issues presented in this matter.  *See Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1083 (9th Cir. 1999); 28 U.S.C. § 1652.

1  of Defendant John Muir Health's Motion to Dismiss Plaintiff's First Amended Complaint

2  (hereinafter "JMH Motion to Dismiss"), pg. 5:3-4. In support, JMH offers only its own self-

3  serving interpretation of a single provision of the Services Agreements, disregarding all other

4  indications of the parties' intent. California law does not permit such careless contractual

5  interpretation methodology.[3] A proper reading of the Services Agreements, taking into

6  consideration all of their provisions, their addenda, the context and circumstances surrounding

7  their formation, the parties' conduct, and other relevant extrinsic evidence, reveals that JMH and

8  TCC mutually intended that the Services Agreements would terminate no sooner than their

9  expressly delineated termination dates, absent good cause for early termination.[4]

10        **1.**     **The 90 Day Notice Provision is Silent on The Issue of**

11                  **Acceptable Cause for Termination**

12          JMH's assertion of an absolute right to terminate the Services Agreements rests

13  upon its misinterpretation of a single sentence. The Services Agreements each contain a 90 Day

14  Notice Provision stating that "[e]ither party may terminate this agreement by giving the other

15  party 90 days written notice." *See* FAC; Ex. A at pg. 3, ¶ 5; Ex. B at 3, ¶ 5. Based on this alone,

16  JMH contends that it had an absolute right to terminate the Services Agreements at any time,

17

18

19      [3]    *See* Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the

20  mutual intention of the parties as it existed at the time of contracting, so far as the same is
    ascertainable and lawful."); *Pac. Gas & Elec. Co. v. Thomas Drayage & Rigging Co., Inc.*, 69

21  Cal. 2d 33, 38 (1968) ("intention of the parties as expressed in the contract is the source of

22  contractual rights and duties").

23      [4]    JMH erroneously suggests that a cause requirement for early termination would be
    an "implied term" of the Services Agreements. JMH Motion to Dismiss, pg. 5:7-8. However, the

24  issue presented here merely requires proper interpretation of the Services Agreements as written.
    The January 2003 Addendum sets forth, in express terms, an *extension* of the "length" of the

25  Services Agreements "such that the agreements terminate on December 31, 2007." FAC, Ex. C

26  at ¶ 3. JMH's unjustified early "termination" of the Services Agreements, and subsequent failure
    to perform its ongoing obligations, constitute a breach of the Services Agreements. *See* FAC, ¶

27  64. Nothing need be "implied." Nor does JMH's promise not to terminate the Services
    Agreements without cause involve any "implied" terms. This Court need not "rewrite" the

28  Services Agreements or their addenda, but instead need only interpret them to ascertain the intent
    of the parties expressed therein. *See* Civ. Code § 1636; *Pac. Gas & Elec.*, 69 Cal. 2d at 38.

1   under any possible circumstances, with or without cause, and even in bad faith.  JMH's position

2   does not withstand scrutiny.

      **a.**      **California Law Treats "Termination Upon Notice" Contract**

                **Provisions as Silent on Acceptable Termination Grounds**

5         Where the termination provision of an agreement provides for a specified notice

6   period but does not refer to the acceptable grounds for termination, the provision should be read

7   as silent on the acceptable grounds for termination. *See Esbensen v. Userware Int'l, Inc.*, 11 Cal.

8   App. 4th 631, 636 (1992) (termination provision in contract for one-year term expressly

9   permitting termination upon two weeks written notice is "silent on the acceptable grounds for

10   termination"); *Sherman v. Mutual Benefit Life Ins. Co.*, 633 F.2d 782, 784 (9th Cir. 1980) (clause

11   stating that the agreement "may be terminated at any time by either party, by giving the other

12   sixty days' notice to that effect" does not indicate whether cause is a termination prerequisite).[5]

13         In *Esbensen*, the agreement at issue included a paragraph entitled "Termination."

14   *Esbensen*, 11 Cal. App. 4th at 635.  This "Termination" provision stated:  "This agreement may

15   be terminated by either party by giving two weeks notice of termination to the other party." *Id.*

16   The *Esbensen* court determined that this provision was "silent on the acceptable grounds for

17   termination." *Id.* at 636.  The *Esbensen* court concluded that "it is only by implication that we

18   can determine what the parties intended with regard to the proper bases for termination," and

19   therefore found that extrinsic evidence should be consulted to determine the parties' intent with

20   respect to acceptable grounds for termination. *Id.* at 638.[6]

21         In *Sherman*, the agreement at issue included a termination clause entitled "Basis

22   of Termination." *Sherman*, 633 F.2d at 783.  The provision stated that the agreement "may be

---

24       [5]    *See also Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 397 (2006) (contractual

25   provision "that allows for termination 'upon notice' does not, by itself, shed light on whether the
parties intended an at-will employment contract") (Moreno, J., concurring).

27       [6]    The *Esbensen* court acknowledged that "[i]t could be argued that the failure to
specify grounds necessarily implies that *any* reason was acceptable." *Esbensen*, 11 Cal. App. 4th

28   at 640 (emphasis in original).  Nonetheless, the *Esbensen* court found that even if such a
presumption or implication existed, it would not preclude introduction of extrinsic evidence to
demonstrate a contrary understanding between the parties. *Id.*

1    terminated at any time by either party, by giving the other sixty days' notice to that effect." *Id.*

2    The *Sherman* court held that this termination provision could reasonably be interpreted as

3    including a prerequisite of good cause. *Id.* at 784.

4          The 90 Day Notice Provision at issue here is identical to the termination

5    provisions at issue in *Esbensen* and *Sherman* in all relevant respects. All state that either party

6    may terminate the agreement, and all specify a notice period for such termination. None say

7    anything about acceptable grounds for cause.[7]

8          California's courts have consistently held that "termination upon notice"

9    provisions like the 90 Day Notice Provision here are silent on the issue of acceptable cause for

10   termination. Both *Esbensen* and *Sherman* followed this rule in refusing to read an "at will"

11   clause into termination clauses qualified only by a notice requirement. Accordingly, courts

12   evaluating whether agreements are terminable "at will" cannot rely on "termination upon notice"

13   provisions, but instead must look further to discern the parties' intent regarding permissible

14   *grounds* for termination, including other provisions of the written agreements, the circumstances

15   surrounding formation of the agreements, the parties' conduct, and any prior or collateral oral

16   understandings concerning acceptable cause for termination.

17        **b.**      **The 90 Day Notice Provisions' Good Cause Requirement is Not**

18                    **Negated by Other Provisions of the Services Agreements**

19          JMH contends that the 90 Day Notice Provision, despite its silence on the issue of

20   acceptable grounds for its invocation, must be read as an "at will" termination provision because

21   the Services Agreements contain a separate provision permitting termination for cause under

22   specific circumstances. *See* JMH Motion to Dismiss, pg. 8:9-10; *see also* FAC, Ex. A at p. 3, ¶

23   1, Ex. B at p. 3, ¶ 1 (hereinafter the "Notice-and-Cure-Provision"). However, the Notice-and-

24   Cure Provision provides no basis for JMH's conclusion.

25          The Notice-and-Cure Provision serves an entirely different function than the 90

26   Day Notice Provision. The Notice-and-Cure Provision delineates specific procedures in the

27

28       [7]      Indeed, the *Sherman* court refused to discern acceptable grounds for termination from a "termination upon notice" provision, even where the provision at issue was entitled "Basis of Termination." *See Sherman*, 633 F.2d at 783.

471.01.PLE.oppo.jmh.mot.dismiss.Brief.wpd       9

1   event TCC's fails to meet its obligations. It provides for notice of breach, opportunity to cure,

2   and termination upon shortened notice for failure to cure.[8] The purpose of the Notice-and-Cure

3   Provision is not to facilitate contract termination for cause, but to *prevent* termination in the

4   event that TCC fails to meet its obligations by affording TCC an opportunity to cure any alleged

5   failure to perform. The Notice-and-Cure Provision functions only in the limited circumstances of

6   TCC's breach, and only provides JMH a limited, unilateral right to terminate in the event of

7   TCC's failure to cure its breach. The existence of such a narrow provision, the intent of which is

8   to prevent, not facilitate, early termination, cannot reasonably be read to preclude the existence of

9   other "for cause" termination provisions within the Services Agreements.

10          Moreover, even where an agreement does include both "for cause" and "upon

11  notice" termination provisions, the presence of the "for cause" provision does not preclude

12  interpretation that the "upon notice" termination provision also requires good cause for its

13  invocation. For example, the agreement at issue in *Sherman* permitted both parties to terminate

14  with sixty days written notice, and also permitted one party to terminate immediately "if in its

15  judgment its interests so require." *Sherman*, 633 F.2d at 783.[9] The fact that the latter provision

16  pertained to termination for cause did not prevent the *Sherman* court from finding that the

17  termination provision only expressly requiring "sixty days' notice" could reasonably be

18  interpreted to require cause as well. *Id.* at 784. Accordingly, JMH's argument is without merit.

19  ///

20

21

22  _____

23          [8]     The Notice-and-Cure Provision provides: "In the event that TCC fails to meet its
    obligations under this agreement, [JMH] shall give notice in writing and allow 5 days from the
24  receipt of said notice for correction of the problem. In the event that [JMH] is not satisfied with
    the correction of the problem, [JMH] will give an additional written notice and shall allow an
25  additional 5 days for correction of the problem from the receipt of the notice. In the even that
    [JMH] is still not satisfied with the corrective action, [JMH] shall give 30-day notice of
26  termination of this agreement." FAC, Ex. A at p. 3, ¶ 1, Ex. B at p. 3, ¶ 1.

27          [9]     The termination provision at issue in *Sherman* stated: "This Agreement may be
    terminated at any time by either party, by giving the other sixty days' notice to that effect; or it
28  may be terminated immediately by the Company if in its judgment its interests so require."
    *Sherman*, 633 F.2d at 783.

2.     **The Services Agreements, as Appropriately Interpreted,**

**Require Good Cause for Termination**

JMH's focus on the 90 Day Notice Provision, to the exclusion of virtually all other aspects of the Services Agreements, is inappropriate. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Civ. Code § 1641; *see also Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 760 (1942) (portions of written instruments, even if clear and explicit, cannot by themselves furnish conclusive evidence of the intent of the parties); *Sunset Sec. Co. v. Coward McCann, Inc.*, 47 Cal. 2d 907, 911 (1957) ("every provision of a contract should be examined to determine the meaning and intention of the parties"); *Rodriguez v. Barnett*, 52 Cal. 2d 154, 160 (1959) ("It is well settled that in construing a contract the meaning of the words used is to be determined from a reading of the entire contract."). An appropriate reading of the entirety of the Services Agreements and their addenda, placed in proper context, reveals the parties' mutual understanding that TCC would be the exclusive provider of medical transcription services to JMH through December 31, 2007, absent good cause for early termination.

a.     **The Services Agreements Set Forth Firm Expiration Dates**

The Services Agreements are, first and foremost, term agreements set to terminate on specific dates. Both Services Agreements specify that the initial term of the agreement "shall be five years" and provide a specific date upon which the agreement was to terminate. FAC, Ex. A at pg. 3, ¶ 4 ("The term of this agreement shall be five years, commencing on April 17, 2000, and terminating on April 16, 2005."); Ex. B at pg. 3, ¶ 4 ("The term of this agreement shall be five years, commencing on September 25, 2000, and terminating on September 24, 2005."). The January 2003 Addendum expressly "*[e]xtend[s] the length* of both agreements such that the agreements terminate on December 31, 2007." *Id.*, Ex. C, ¶ 3 (emphasis added).

If the Services Agreements were terminable at either parties' whim, as JMH contends, phrases concerning the date on which the agreements terminate, and provisions extending that "length," would be meaningless. Accordingly, JMH's proffered interpretation is untenable. *See* Civ. Code § 1641 (contracts must be interpreted "so as to give effect to every

1    part"); *see also Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 177 Cal. App. 3d 726, 730 (1986)

2    (courts must view contract language "in light of the instrument as a whole" and "give effect to

3    every provision" where possible).

         **b.**      **The January 2003 Addendum Expressly Extends the Services**

                  **Agreements Through December 31, 2007**

6          The January 2003 Addendum resolves any doubt concerning whether the Services

7    Agreements could be terminated without cause prior to their specified termination dates.  The

8    language of the January 2003 Addendum, and the nature of the bargain within the January 2003

9    Addendum, show conclusively that the parties intended that the Services Agreements would not

10    be terminated prior to December 31, 2007 without cause.

11          The January 2003 Addendum sets forth an adjusted pricing scheme that

12    presupposes the Services Agreements to be in effect through December 31, 2007.  Through the

13    January 2003 Addendum, TCC agreed to forfeit cost of living rate adjustments in the years 2003

14    and 2007.  FAC, Ex. C, ¶¶ 5-7.  TCC's forfeiture of its most immediate cost of living rate

15    increase was obviously in anticipation of future compensatory cost of living adjustments.  TCC

16    also agreed to forfeit its cost of living adjustment for 2007, evidencing both parties' anticipation

17    that the Services Agreements would still be in effect at that time.

18          In exchange for TCC's concession of future rights, JMH extended the length of

19    both Services Agreements "such that the agreements terminate on December 31, 2007," and

20    permitted TCC to include a modest HIPAA surcharge in its rates.  FAC, Ex. C, ¶¶ 3-4.  The

21    language extending the Services Agreements "such that the agreements terminate" at the end of

22    2007 unambiguously reflects an intent that the agreements were not to terminate prior to the

23    specified date without good cause.

24          The nature of the bargain culminating in the written January 2003 Addendum

25    itself confirms what the language of the January 2003 Addendum provides.  TCC would not have

26    bargained for an extension of the Services Agreements through 2007 if it believed that JMH

27    could simply abandon the agreement for no reason, or in bad faith, at any time.  Likewise, JMH

28    would not have bargained for rights with respect to TCC's forfeiture of a cost of living

1  adjustment in 2007 if it believed that TCC could simply abandon the agreement for no reason

2  and in bad faith at any time. When JMH and TCC made the January 2003 Addendum, both

3  parties understood that they were extending the Services Agreements through December 31,

4  2007, and that neither party would be able to simply terminate the Services Agreements without

5  cause – and negotiated accordingly.

6            c.      **The Circumstances Surrounding Formation of the Services**

7                    **Agreements and Addenda Confirm That the 90 Day Notice**

8                    **Provision Only Permits Termination For Good Cause**

9            The circumstances surrounding formation of the Services Agreements further

10  confirm the parties' intent that the Services Agreements be terminated early only for cause.

11  Consideration of such circumstances is both necessary and appropriate, as contracts should be

12  explained by reference to the circumstances under which they were made.  Civil Code § 1647.[10]

13           Here, TCC was created for the sole purpose of providing medical transcription

14  services for JMH.  TCC was not just any JMH contractor.  TCC was created *at JMH's request.*

15  JMH was fully aware that TCC was created for JMH's benefit, and would depend on JMH's

16  business for its survival.  JMH was also aware of the substantial investment that creating and

17  maintaining TCC would necessarily entail.  These circumstances strongly suggest that TCC's

18  agreement securing JMH's business was understood to be terminable only with good cause.

19           d.      **The Parties' Conduct in Performing the Services Agreements**

20                   **Evidences Their Understanding of its Firm Termination Dates**

21           Courts also must look to the parties' conduct in performing the agreement for

22  evidence of their intent.  *See Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 753 (1960)

23  ("The acts of the parties under the contract afford one of the most reliable means of arriving at

24  their intention"); *Goodman v. Severin*, 274 Cal. App. 2d 885, 895 (1969) (parties demonstrate

25  understanding of agreement through their conduct).

26

27           [10]      *See also Walnut Creek Pipe Distribs., Inc. v. Gates Rubber Co. Sales Div., Inc.,*

28  228 Cal. App. 2d 810, 814 (1964) (evidence of informal dealings was properly considered "under
the well-established rules that a contract may be explained by reference to the circumstances
under which it was made").

1        TCC has never behaved like a company that believed that its only source of

2   income was subject to termination at any time without cause.  Creating TCC required a

3   substantial investment of capital, time, and labor.  Maintaining TCC as an ongoing concern

4   required even further investment.  By the end of 2000, less than a year into the term of the

5   Services Agreements, TCC had already invested hundreds of thousands of dollars in software,

6   hardware, and other items necessary to serve JMH's transcription needs.  TCC continued to

7   invest substantial sums in subsequent years, including approximately $135,500 in computers and

8   peripherals, $120,000 in software, and $12,500 in office equipment between 2002 and 2003.

9   Making investments of this magnitude for the sole purpose of providing services under an

10  agreement JMH could terminate at any time and without reason simply would not make sense.

11  *See Sherman*, 633 F.2d at 784 (considering evidence that employee "gave up a profitable

12  business" to work in a position that "only becomes lucrative after a substantial investment of

13  time and capital," and concluding that clause permitting termination "at any time by either party,

14  by giving the other sixty days' notice to that effect" is "reasonably susceptible to an interpretation

15  requiring good cause for termination").

16       Most telling, however, was the conduct of both parties in negotiating the January

17  2003 Addendum.  In September 2002, TCC approached JMH to address the increased costs

18  associated with new HIPAA rules.  TCC estimated that the cost of new hardware and software

19  necessary for HIPAA compliance at approximately $160,000.  TCC determined that it could

20  recover that amount with a surcharge of $.005 per transcribed line over the course of the 36

21  months then remaining on the Services Agreements.  JMH agreed to a surcharge, but wanted a

22  lower surcharge extended over a longer period of time.  Thus, JMH proposed a $.003 surcharge

23  per transcribed line, coupled with an extension of the Services Agreements to last at least 59

24  months, such that the lower surcharge would cover the entire $160,000 in estimated costs.  JMH

25  also used this contract extension as a bargaining chip to persuade TCC to forfeit its cost of living

26  adjustments for 2003 and 2007.  TCC agreed to these terms because its estimated upgrade costs

27  would be covered by the modest surcharge over the course of the newly extended agreement

28

1   term, and because the contract extension guaranteed that TCC would remain JMH's exclusive

2   transcription service provider for an extended period of time.

3          If the Services Agreements had been terminable by either party at will, the

4   negotiations surrounding the January 2003 Addendum would make no sense. JMH would not

5   have offered to extend the contract as a means of lowering the surcharge and inducing forfeiture

6   of prospective cost of living adjustments, and TCC certainly would not have accepted such an

7   offer, because such an extension would have been meaningless. Instead, TCC would have asked

8   for the $160,000 estimated upgrade costs up-front, rather than amortizing the cost over the full

9   term of the agreement. The manner in which TCC and JMH conducted themselves in the course

10  of negotiations over the January 2003 Addendum is antithetical to an understanding that the

11  Services Agreements were terminable without cause.[11]

12          **3.     Extrinsic Evidence of the Parties' Intent Must be Admitted, if**

13          **Necessary, to Show That the Services Agreements Required**

14          **Good Cause for Early Termination**

15          TCC will introduce evidence, at the appropriate time, that an oral understanding

16  existed between TCC and JMH at the time the Services Agreements were created. Pursuant to

17  this oral understanding, both TCC and JMH understood that, absent valid justification or cause

18  for termination, the Services Agreements would terminate no sooner than the expiration dates

19  expressly set forth in the written agreements. *See* FAC, ¶ 28. Such evidence is relevant to

20  establish the complete agreement between TCC and JMH, to show that the 90 Day Notice

21  Provision was not intended to permit the parties to terminate the Services Agreements without

22  cause, and to show that provisions of the Services Agreements concerning the agreements'

23  "length" established firm termination dates, absent good cause for early termination.

24          Given that the Services Agreements are not fully integrated, evidence of this prior

25  oral understanding must be admitted so that this Court can determine the complete agreement

26  between the parties. Moreover, even if the Services Agreements were fully integrated, evidence

27

28          [11]     *See Goodman*, 274 Cal. App. 2d at 895 (concerning parties' mutual understanding
    of their contractual rights and obligations, their "actions speak louder than words") (quoting
    *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960)).

1  of the parties' prior oral understanding concerning acceptable cause for termination of the

2  agreements would be admissible as evidence of the parties' intent because the 90 Day Notice

3  Provision is reasonably susceptible to an interpretation consistent with that understanding.

4          **a.**    **The Services Agreements are Incomplete and Only Partially**

5              **Integrated, and Extrinsic Evidence Must Be Permitted to**

6              **Present the Complete Agreement**

7        JMH, without reference to any provision of the Services Agreements or any

8  authority, casually refers to the Services Agreements as "integrated." *See* JMH Motion to

9  Dismiss, pg. 2:3. That statement is wrong. The Services Agreements are not fully integrated,

10  and TCC may offer relevant extrinsic evidence to supplement and explain their terms.

11        Where parties have agreed that a written instrument is the exclusive and final

12  embodiment of their contract, the written agreement is considered "integrated" and parol

13  evidence is not admissible to alter or enlarge its terms. *Masterson v. Sine*, 68 Cal. 2d 222, 225

14  (1968); *Brawthen v. H & R Block, Inc.*, 28 Cal. App. 3d 131, 137 (1972). When only part of the

15  agreement is integrated, extrinsic evidence may be introduced to prove elements of the agreement

16  not reduced to writing. *Masterson*, 68 Cal. 2d at 225. Extrinsic evidence of prior or

17  contemporaneous oral understandings concerning matters not expressly set forth in the written

18  instrument is admissible to aid in establishing the complete agreement. *Esbensen*, 11 Cal. App.

19  4th at *638; Brawthen*, 28 Cal. App. 3d at 137.

20        "The crucial issue in determining whether there has been an integration is whether

21  the parties intended their writing to serve as the exclusive embodiment of their agreement."

22  *Masterson*, 68 Cal. 2d at 225. In making this determination, courts look to multiple factors,

23  including whether the language contains an integration clause,[12] the completeness of the written

24  agreement, and whether the jury would be misled by the parol testimony. *McLain v. Great*

25  *American Ins. Cos.*, 208 Cal. App. 3d 1476, 1484 (1989). Circumstances at the time of the

26

27      [12]    An agreement may state, for example, that "there are no previous understandings

28  or agreements not contained in the writing." *Masterson*, 68 Cal. 2d at 225-226. The Services
Agreements contain no such language, or any comparable language, evidencing an intent to
integrate.

1  writing may also aid in determining whether the agreement was integrated. *Id.; Masterson*, 68

2  Cal. 2d at 226.

3          Where, as here, a written instrument does not expressly provide that it contains

4  the complete agreement, and does not expressly state acceptable grounds for termination, the

5  agreement is unintegrated as to the grounds for termination, and extrinsic evidence must be

6  admitted to complete that aspect of the agreement. *Esbensen*, 11 Cal. App. 4th at 638.

7          Here, the Services Agreements are, at most, partially integrated. The Services

8  Agreements are devoid of any "words of integration."[13] They also do not expressly address the

9  issue of cause for termination, and are therefore incomplete in that regard. Extrinsic evidence

10  should be admitted such that the complete agreement can be presented before this Court.

11          Additionally, the circumstances surrounding the negotiation of the Services

12  Agreements were such that certain aspects of the agreement would logically have been resolved

13  in an informal manner. TCC's founder, Spall, had a preexisting relationship with the staff

14  members at JMH with whom he negotiated the Services Agreements. Spall was asked by these

15  JMH staff members, whom he knew and trusted, to create a medical transcription company to

16  service JMMC's medical transcription needs. The Services Agreements were ultimately

17  negotiated amongst individuals who knew and trusted one another. Such circumstances gave rise

18  to a situation in which details regarding acceptable cause for termination were resolved orally,

19  and were not committed to writing.[14] Such details are properly considered part of the Services

20  Agreements. Evidence of these oral understandings must be permitted, as this Court must

21

22  _____

23          [13]     JMH points out that the Services Agreements require modifications to the
agreements to be in writing. *See* JMH Motion to Dismiss, pg. 8:1-4; FAC, Ex. A at pg. 4, ¶ 5;

24  Ex. B at pg. 4, ¶ 5. However, the clause JMH refers to plainly relates only to prospective
modifications of the agreement, and does not purport to integrate prior negotiations or

25  understandings into the Services Agreements.

26          [14]     Despite that the personnel who prematurely "terminated" the Services Agreements
were different individuals from those with whom Spall and TCC had initially negotiated those

27  agreements, JMH's obligations under the Services Agreements are governed by the
understanding between the parties *at the time the agreements were created. See* Civil Code §

28  1636 (contracts "must be so interpreted as to give effect to the mutual intention of the parties *as
it existed at the time of contracting*") (emphasis added).

1  evaluate the merits of TCC's claim in light of the complete Services Agreements – as the parties

2  understood those agreements at the time they were made. *See* Civil Code § 1636.

3          **b.**       **The Understanding Between JMH and TCC Concerning**

4                 **Acceptable Cause for Termination is One Which Might**

5                 **Naturally Be Made Separately From the Written Instrument**

6          Presentation of evidence of an oral understanding concerning a written instrument

7  must be permitted where it is not inconsistent with the written instrument, and the understanding

8  might "naturally" have been made separately from the writing. *Esbensen*, 11 Cal. App. 4th at

9  638 (citing *Masterson*, 68 Cal. 2d at 228); *see also McLain*, 208 Cal. App. 3d at 1484 (courts

10  evaluating whether evidence of alleged oral agreement is admissible consider "whether the oral

11  agreement might naturally be made as a separate agreement").

12          Courts have found, on multiple occasions, that alleged oral understandings

13  concerning acceptable grounds for termination might naturally be discussed and resolved orally

14  prior to execution of the written agreements. *See, e.g., Esbensen*, 11 Cal. App. 4th at 638

15  (finding it "hardly unnatural" that parties might resolve the issue of proper bases for termination

16  orally); *Brawthen*, 28 Cal. App. 3d at 139 (oral understanding that defendant never terminates the

17  contracts of employees who do a good job might naturally be made separately from written

18  contract).

19          Additionally, the oral understanding between JMH and TCC that the Services

20  Agreements would not be terminated without cause is entirely consistent with the Services

21  Agreements. The parties' mutual understanding that the 90 Day Notice Provision requires good

22  cause for its invocation is consistent with applicable law concerning similar provisions. *See*

23  *Esbensen*, 11 Cal. App. 4th at 636; *Sherman*, 633 F.2d at 784. This mutual understanding is also

24  consistent with, and expressed by, the various terms of the Services Agreements concerning the

25  "length" of the agreements and their mutually agreed upon termination dates. *See* FAC, Ex. A at

26  pg. 3, ¶ 4; Ex. B at pg. 3, ¶ 4. In particular, this mutual understanding is consistent with, and

27  expressed by, the language of the January 2003 Addendum expressly providing for an extension

28  of the Services Agreements through December 31, 2007. *Id.* at Ex. C, ¶ 3. There is no

1  inconsistency between the Services Agreements and the parties' prior mutual understanding that

2  those agreements could not be terminated without cause.

3          **c.**    **The 90 Day Notice Provision is Reasonably Susceptible to**

4                 **Interpretation as a "For Cause" Termination Provision**

5          Even if the Services Agreements were fully integrated, extrinsic evidence of a

6  prior oral understanding that the 90 Day Notice Provision was intended as a "for cause"

7  provision would still be admissible.  Where a contract is fully integrated, extrinsic evidence is

8  admissible where relevant to establish the meaning of a written instrument, if the writing is

9  "reasonably susceptible" to the interpretation that evidence is offered to prove.  *McLain*, 208 Cal.

10  App. 3d at 1485-86 (citing *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., Inc.*,

11  69 Cal. 2d 33, 37 (1968)).

12          Despite JMH's bare assertion that the Services Agreements are not reasonably

13  susceptible to an interpretation that they require cause for termination,[15] courts have deemed

14  provisions like the 90 Day Notice Provision "reasonably susceptible" to such interpretation.  *See,*

15  *e.g., Sherman*, 633 F.2d at 784 (termination clause permitting termination "at any time by either

16  party, by giving the other sixty days' notice to that effect" is "reasonably susceptible to an

17  interpretation requiring good cause for termination").

18          Moreover, the prior oral understanding alleged is entirely consistent with several

19  other Services Agreement provisions, particularly those concerning the length and termination

20  dates of the agreements, and provisions of the January 2003 Addendum unambiguously

21  extending the agreements' term.  *See* FAC, Ex. A at pg. 3, ¶ 4; Ex. B at pg. 3, ¶ 4; Ex. C, ¶ 3.

22  TCC will offer evidence of its contemporaneous oral understanding with JMH showing that the

23  termination dates written into the Services Agreements were meant to be firm, absent good cause

24  for early termination.  In light of the language of these term provisions, and the "extension"

25  provision of the January 2003 Addendum, the Services Agreements are unquestionably

26  reasonably susceptible to an interpretation requiring good cause for their termination.

27  _____

28      [15]    *See* JMH Motion to Dismiss, pg. 6:28-7:2 (stating, without any supporting authority, that the Services Agreements "are simply not 'reasonably susceptible' to the interpretation advanced by TCC's alleged understanding"); *see also id.*, pg. 8:6-9.

471.01.PLE.oppo.jmh.mot.dismiss.Brief.wpd        19

1         Finally, even if this Court were to accept JMH's specious argument that the

2 absence of "cause" language in the 90 Day Notice Provision implies that no such cause is

3 needed, such an implication cannot preclude the introduction of extrinsic evidence *to rebut* that

4 implication. *See Esbensen*, 11 Cal. App. 4th at 640 ("the fact that something is presumed or

5 implied in the absence of an express statement to the contrary does not preclude a party to an

6 incomplete written contract from attempting to demonstrate an express oral agreement contrary

7 to the term which would otherwise be presumed or implied"); *Masterson*, 68 Cal. 2d at 229

8 ("The fact that there is a written memorandum...does not necessarily preclude parol evidence

9 rebutting a term that the law would otherwise presume.").

10     **C.**    **JMH's Conduct Constitutes a Breach of the Implied Covenant of**

11              **Good Faith and Fair Dealing**

12         Even if JMH had, as it claims, absolute discretion to terminate the Services

13 Agreements at any time and without cause, its exercise of this discretion in bad faith constitutes a

14 breach of the implied covenant of good faith and fair dealing.

15         Every contract contains an implied covenant of good faith and fair dealing. *Wallis*

16 *v. Superior Court*, 160 Cal. App. 3d 1109, 1116 (1984). "The essence of the good faith covenant

17 is objectively reasonable conduct." *Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983).

18 Where a contract confers on one party discretionary power affecting the rights of the other, the

19 implied covenant of good faith and fair dealing imposes a duty to exercise that discretion in good

20 faith and in accordance with fair dealing. *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 363

21 (1997). Where one party exercises its discretionary authority in bad faith and thereby frustrates

22 the other party's legitimate expectations under the agreement, it has breached the implied

23 covenant of good faith and fair dealing. *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142,

24 1152 (N.D. Cal. 2002); *see also Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 924 (1985) ("an

25 open term in a contract must be filled in by the party having discretion within the standard of

26 good faith and fair dealing").

27         Here, JMH contends that it had absolute and unfettered discretion to terminate the

28 Services Agreements at any time, for any reason, or for no reason at all. Even if this were true,

1   the implied covenant of good faith and fair dealing would require JMH to exercise that discretion

2   in good faith.  JMH did not do so.

3                    1.      **JMH Both Created and Frustrated TCC's Legitimate Expectations of**

4                            **a Sustainable, Lasting Business Opportunity**

5                    In January of 2003, TCC and JMH entered into negotiations concerning TCC's

6   need to impose a surcharge to cover expenses associated with upgrading its hardware and

7   software to comply with new HIPAA regulations.  TCC estimated the cost at approximately

8   $160,000.  TCC estimated that a $.005 per-line surcharge, charged over the course of the

9   remaining 36 months of the Services Agreements, would cover that cost.  However, when TCC

10  proposed this surcharge, JMH responded by proposing an extension of the term of the Services

11  Agreements through December 31, 2007, a lower per-line surcharge, and TCC's forfeiture of cost

12  of living rate increases for the years 2003 and 2007.

13                   If, in the course of the negotiations leading to the January 2003 Addendum, it had

14  been JMH's understanding and intent that the Services Agreements were terminable at its

15  pleasure, then the conclusion that JMH acted in bad faith is inescapable.  TCC, rightfully

16  perceiving that JMH's proffered "contract extension" was something of meaning and value,

17  willingly forfeited substantive rights under the Services Agreements and made necessary

18  investments to continue serving JMH's medical transcription needs.  Such a promise to "extend"

19  the agreement would obviously be meaningless if JMH had the ability to terminate the Services

20  Agreements at its whim.  JMH's subsequent termination of the Services Agreements, without

21  cause, frustrated TCC's legitimate expectation of continuing business, revoked any value

22  associated with the "extension" for which TCC had bargained and forfeited valuable rights, and

23  ultimately so devastated TCC that it was forced to lay off its employees and discontinue business

24  operations.

25                   TCC came to exist at JMH's request.  JMH has always been aware that TCC

26  depended on JMH for its survival.  TCC incurred substantial debt and made substantial

27  investments, relying on JMH's assurances of a lasting, sustainable business opportunity that

28  would continue so long as TCC satisfied its obligations under the Services Agreements.  These

1    conditions, brought about by JMH's acts and representations, created a legitimate expectation

2    that JMH would continue using TCC as its exclusive provider of medical transcription services,

3    at least until the termination date specified in the Services Agreements.  JMH's bad faith

4    conduct, plainly inconsistent with the intent and spirit of the Services Agreements, cannot be

5    excused.

6          **2.**     **JMH Forced TCC to Compete For Its Own Contract, But Did Not**

7                    **Allow TCC To Compete Fairly**

8            In November of 2003, when JMH became concerned about the use of overseas

9    labor to perform its medical transcription services, TCC entered into the November 2003

10   Addendum, thereby voluntarily agreeing not to use any overseas labor to perform its obligations

11   under the Services Agreements.  TCC, true to its word, never used such overseas labor.

12           In early 2006, nearly two years prior to the agreed-upon termination date, JMH

13   issued a Request for Proposal to solicit bids from other transcription service providers.  TCC

14   responded to this Request for Proposal, announcing its commitment to perform under the

15   Services Agreements and stating that JMH remained under contract with TCC.  Nonetheless,

16   JMH did not honor its agreement with TCC, but instead assigned its medical transcription work

17   to Focus.

18           Focus was able to provide medical transcription services to JMH at a lower price

19   than TCC because Focus primarily uses and contracts with medical transcription labor based

20   outside of the United States.  TCC, on the other hand, was expressly prohibited by the November

21   2003 Addendum to the Services Agreements from using transcriptionists residing outside of the

22   United States.  Due to these circumstances, created by JMH, TCC was unable to offer a

23   competitive bid for its own medical transcription work.

24           In sum, JMH persuaded TCC to execute an addendum to the Services Agreements

25   committing not to use medical transcriptionists based outside of the United States, and then

26   prematurely terminated its agreements with TCC so that it could get cut-rate medical

27   transcription work done by Focus, a company known to use medical transcription labor primarily

28   based overseas.  In doing so, JMH wrongly forced TCC to compete for its own medical

1  transcription services contract, and created an uneven playing field for that very competition.

2  JMH's actions in this regard, antithetical to the Services Agreements themselves, were not in

3  keeping with the principles of good faith and fair dealing.

3.  **JMH Cannot Escape Responsibility For Its Bad Faith Conduct By**

    **Reference To The 90 Day Notice Provision**

6  JMH does not argue that the allegations against it do not constitute bad faith

7  conduct.  Instead, JMH seeks to escape liability for its breach of the implied covenant of good

8  faith and fair dealing the same way it seeks to escape liability for breaching the Services

9  Agreements' express terms – by pointing to the 90 Day Notice Provision.  However, the 90 Day

10 Notice Provision does not grant JMH the right to act in bad faith.

11 JMH cites several cases for the familiar proposition that the implied covenant of

12 good faith and fair dealing cannot be read to prevent a party from doing what it is *expressly*

13 permitted to do under the written agreement.  *See* JMH Motion to Dismiss, pg. 9:16-23.  All such

14 cases are distinguishable here because the Services Agreements do not expressly permit early

15 termination of the Services Agreements without cause, much less early termination of the

16 Services Agreements in bad faith.  As set forth above, a contractual termination provision

17 qualified only by a notice period is *silent* on the issue of cause for termination.  *See Esbensen*, 11

18 Cal. App. 4th at 636; *Sherman*, 633 F.2d at 784.  The 90 Day Notice Provision does not

19 "expressly" address acceptable cause for termination of the Services Agreements at all, much less

20 "expressly" authorize termination under any possible circumstances.  The 90 Day Notice

21 Provision certainly cannot be read to "expressly" authorize termination in bad faith.

22 Contrary to what JMH argues, JMH was not within its rights to negotiate what it

23 now claims is a meaningless contract extension with TCC, "terminate" the Services Agreements

24 before the expiration date agreed upon in those negotiations, force TCC to compete for its own

25 contract, and then give the contract to a company with an unfair competitive advantage created

26 by TCC's own gratuitous agreement not to use foreign labor.  JMH cannot conduct business in

27 this manner, and then hide behind self-serving interpretations of vague termination clauses in its

28

1 | agreements.  Instead, justice requires that JMH be made to compensate TCC for the harm caused

2 | by its bad faith conduct.

3 | **D.** **Leave to Amend Should Be Granted to Correct Pleading Deficiencies,**

4 | **If Any**

5 | If this Court detects any pleading deficiencies in the FAC, TCC should be granted

6 | leave to amend.  Such leave is freely and liberally granted.  *See* Fed. R. Civ. P. 15(a); *see also*

7 | *Livid Holdings*, 416 F.3d at 946 (dismissal of complaint without leave to amend "is improper

8 | unless it is clear that the complaint could not be saved by any amendment").  Regardless of

9 | JMH's speculation that TCC's First Amended Complaint reflects its "best case" against JMH,[16] it

10 | would be inappropriate to dismiss TCC's entire action against JMH with prejudice without ever

11 | affording TCC the benefit of an opportunity to correct any pleading deficiencies.

12 | **IV.  CONCLUSION**

13 | For the foregoing reasons, this Court should deny JMH's motion to dismiss

14 | TCC's First Amended Complaint.

15 | Dated: November 17, 2008

16 | MENNEMEIER, GLASSMAN & STROUD LLP
KENNETH C. MENNEMEIER
LANDON D. BAILEY

19 | Kenneth C. Mennemeier
Attorneys for Plaintiff
20 | Transcription Communications Corporation

---

[16] *See* JMH Motion to Dismiss, pg. 2:7-9.

471.01.PLE.oppo.jmh.mot.dismiss.Brief.wpd          24

PLAINTIFF'S OPPO. TO JMH'S MOTION TO DISMISS FIRST AMENDED COMPLAINT – 08-CV-04418 TEH

1 | Case Name:   *Transcription Communications Corporation v. John Muir Health, et al.*

2 | Case No:      U.S. District Court, Northern District, Case No.: 08-CV-04418-THE

3 | ### CERTIFICATE OF SERVICE

4 | I declare as follows:

5 | I am a resident of the State of California and over the age of eighteen years, and

6 | not a party to the within action; my business address is 980 9th Street, Suite 1700, Sacramento,

7 | California 95814.  On November 17, 2008, I served the within documents:

8 |

9 | **PLAINTIFF TRANSCRIPTION COMMUNICATIONS CORPORATIONS' OPPOSITION TO JOHN MUIR HEALTH'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

10 |

11 | ⊠       by placing the document(s) listed above in a sealed envelope with postage

12 | thereon fully prepared, in the United States mail at Sacramento, California

13 | addressed as set forth below.

14 | James D. Holden

15 | Hanson Bridgett LLP
425 Market Street, 26th Floor

16 | San Francisco, CA 94105

17 |

18 | I am readily familiar with the firm's practice of collection and processing

19 | correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal

20 | Service on that same day with postage thereon fully prepared in the ordinary course of business.

21 | I declare that I am employed in the office of a member of the bar of this Court at

22 | whose direction this service was made.

23 | Executed on November 17, 2008, at Sacramento, California.

24 |

25 | Melissa Haagensen

26 |

27 |

28 |