1
2
3
4                    IN THE UNITED STATES DISTRICT COURT
5                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7
8
9
10   TRANSCRIPTION
     COMMUNICATIONS                          NO. C 08-4418 TEH
     CORPORATION,
11                                           **ORDER ON DEFENDANTS'**
                         Plaintiff,          **MOTIONS TO DISMISS**
12
                 v.
13
     JOHN MUIR HEALTH *et al.*,
14
                         Defendants.
15
16
17        This matter came before the Court on Monday, February 2, 2009, on the Motions to
18   Dismiss of Defendant John Muir Health and of Defendants Focus Infomatics, Inc.,
19   eScription., Inc., and Nuance Communications, Inc.  Having carefully considered the parties'
20   written and oral arguments, John Muir Health's Motion to Dismiss is GRANTED and the
21   Motion to Dismiss of Focus, eScription, and Nuance is GRANTED IN PART and DENIED
22   IN PART for the reasons set forth below.
23
24   **FACTUAL AND PROCEDURAL BACKGROUND**
25        Because this case is before the Court on Defendants' Motions to Dismiss, the Court
26   must accept all facts as represented by the non-moving party, which here is Plaintiff
27   Transcription Communications Corporation ("TCC").  This version of the facts is based upon
28   that alleged in TCC's First Amended Complaint ("FAC").  TCC was founded in 2000 when

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   representatives of John Muir Health ("JMH"), a medical group, approached Richard Spall

2   and asked him to create a new medical transcription services company to provide John Muir

3   Medical Center ("JMMC") with transcription services.  JMH assured Spall that this would be

4   a sustainable business opportunity, that his company would exclusively provide JMMC with

5   transcription services, and that the relationship would continue so long as there was no cause

6   or justification for termination of the relationship.  Spall incorporated TCC in January of

7   2000, developed TCC from January to March of that year, and signed a contract, called a

8   Services Agreement, with JMH to exclusively provide medical transcription services to

9   JMMC starting in April of 2000.

10   In June of that year, JMH asked TCC to provide the same services to Mount Diablo

11   Medical Center ("MDMC").  Although initially reluctant, in July of 2000 TCC entered a

12   written agreement with JMH to provide MDMC with transcription services beginning in

13   September of that year.  By the end of 2000, TCC had accumulated nearly $300,000 in debt.

14   In 2001, TCC invested approximately $50,000 more in materials to provide services to JMH.

15   The contracts with JMH provided for payment of $.17 per line transcribed for the first

16   twelve months of the contract, and for annual cost-of-living adjustments to TCC's rates.

17   Both contracts provided for a five-year term of service, with the relationship with JMMC to

18   terminate on April 16, 2005, and that with MDMC to terminate on September 24, 2005,

19   except with MDMC's emergency room and radiation oncology dictation, which were to

20   terminate on September 17, 2005.  The contracts also contained a clause enabling either party

21   to terminate the "Services Agreements" by giving the other party ninety days' written notice.

22   The written agreements do not specify on the basis of what cause or circumstances would

23   termination be permitted.  TCC alleges that both parties understood at the time of entering

24   the agreements that, absent valid justification or cause for termination, the agreements would

25   terminate after five years and no sooner.  TCC attached the Services Agreements to its

26   complaint.

27   In September of 2002, TCC informed JMH that compliance with the new federal

28   Health Insurance Portability and Accountability Act ("HIPAA") would require significant

2

financial expenditures.  The parties negotiated and agreed to a HIPAA surcharge of $.003 per line for 59 months for HIPAA-compliant services, an extension of the contracts through December 31, 2007, and the cancellation of certain cost-of-living adjustments ("COLA") from the original contracts.  This addendum was executed on January 31, 2003.  TCC maintains that the consideration for this modification was that TCC would forego COLA increases in 2003 and 2007 and would purchase equipment and train staff as necessary for HIPAA compliance, in exchange for the HIPAA surcharge beginning in February of 2003 and the extension of the contracts to the end of 2007.  TCC invested approximately $268,000 in equipment to comply with the terms of this addendum.

On November 3, 2003, JMH and TCC signed a second addendum, at JMH's request, in which TCC agreed that it would not use overseas transcriptionists.  This addendum was signed following a medical records extortion scare in the medical community, in which an outsourced transcriptionist who was not paid for her work threatened to post private medical information on the internet if she did not receive her pay.  TCC states that at all times it complied with this addendum.

From the beginning of the contract, TCC used Crescendo Systems Corporation ("Crescendo") software to fulfill its contract with JMH, and invested thousands of dollars in purchasing and maintaining these systems.  In August of 2004, JMH invited the staff of TCC to attend a sales presentation on eScription's transcription software.  Unlike the Crescendo software in use by TCC, the eScription presentation focused on its voice recognition software.  The presentation represented to JMH that use of eScription software would result in significant monetary savings attributable to its technological advantages, and did not mention that eScription's preferred providers of services through its "MTSO Alliance Program" outsourced transcription work overseas.  In response to JMH's interest in using voice recognition software, TCC had representatives of Crescendo present their voice recognition software to JMH.  JMH responded positively, and TCC in 2004 invested another $60,000 to update its software and facilitate the use of Crescendo's voice recognition software.

3

United States District Court

For the Northern District of California

In September of 2005, JMH advised TCC that JMH intended to pursue the direct purchase of eScription software from eScription.  eScription continued to tell JMH that use of its software would result in significant savings over the rates JMH had been paying TCC.  According to TCC, JMH remained unaware that much of these savings would be realized by use of outsourced transcription services, including those offered by Focus, which was one of eScription's preferred transcription providers in its "MTSO Alliance Program."  TCC maintains that this information was excluded from eScription's communications with JMH by false and/or misleading misrepresentations and material omissions.  That October, eScription sold its software to JMH.  JMH informed TCC that it did not expect to implement the use of the new software until July of 2006.

In February or March of 2006, JMH issued a Request For Proposals to provide transcription services to JMH ("RFP").  The RFP stated that the contractor would be required not to outsource transcription labor.  TCC submitted a response to the RFP on March 10, 2006, in which it stated that it would be willing to continue to provide transcription services at a rate of $.184 per line for John Muir and at $.181 per line for Mount Diablo.  TCC reminded JMH that it had already purchased and installed the Crescendo voice recognition software to meet JMH's request, and that it would not use the eScription software because it was expensive and would not improve quality or decrease costs.  TCC asserted that any termination of the contracts prior to the end of 2007 would be breach of the agreement reached in January of 2003.  Focus also submitted a bid to the RFP, quoting a rate far lower than that TCC had bid.  Focus committed to provide services without resort to outsourced transcriptionists.  TCC now alleges that Focus knew it did not intend to perform the contract using only domestic transcriptionists.

On July 17, 2006, TCC received written notice from JMH that JMH intended to terminate the contracts effective October 24, 2006, which was 99 days later.  TCC maintains in its complaint that at no time did TCC perform unsatisfactory services pursuant to its contracts with JMH.  JMH did not claim in its written notice that it had cause or justification for its termination of the contract, other than its desire to use eScription's software.

TCC brought suit against Defendants JMH, a medical services company, Focus, a medical transcription services company, eScription, a voice-recognition software company, and Nuance, a speech and imaging services company that acquired both Focus and eScription; TCC claims that Nuance is a successor-in-interest to claims against Focus and eScription.  In the First Amended Complaint, TCC states four causes of action: 1) Breach of contract against JMH for terminating its contract, breaching the implied covenant of good faith and fair dealing, and/or violating a contemporaneous oral agreement that neither party would terminate a services agreement without valid justification or cause; 2) Intentional Interference with Contractual Relations claim against Focus, eScription, and Nuance for interfering with known contractual relationships between TCC and JMH; 3) Intentional Interference with Prospective Economic Advantage claim against Focus, eScription, and Nuance for interfering with the ongoing business relationship between JMH and TCC by inducing a disruption of that relationship; and 4) RICO claim against Focus, eScription, and Nuance for deliberately and actively deceiving multiple hospitals to believe that their product was technologically superior when in fact they achieved economic advantage by using outsourced labor.

All Defendants have filed motions to dismiss the FAC under Rule 12(b)(6) which are presently before the Court.

**DISCUSSION**

**Legal Standard**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true, construing all facts in the light most favorable to the plaintiff, unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th

Cir. 2001).  The court is not required "to accept as true allegations that are merely

conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden*

*State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A court should not grant dismissal unless

the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

**Discussion**

As this order deals with two separate motions to dismiss, the Court will address them

in turn.

**I.  JMH's Motion to Dismiss**

Defendant JMH moves the Court to dismiss the first amended complaint, asserting

that: 1) TCC admits in its complaint that JMH met its contractual obligations by providing

more notice for termination than the contract required; 2) extrinsic evidence of any

understanding between the parties did not modify the written contract; 3) the implied

covenant of good faith and fair dealing does not modify JMH's express right to terminate the

contracts on proper notice; and 4) TCC failed to plead any contemporaneous oral agreement

limiting the right to terminate under the express terms of the agreement, nor can TCC enforce

any such parol agreement.

Although JMH offers a number of rationales to justify dismissal of TCC's first cause

of action for breach of contract, the gravamen of its legal argument is that the express terms

of the first contract between JMH and TCC permitted termination because it included the

following termination clause: "Either party may terminate this agreement by giving the other

party 90 days written notice."  FAC Ex. A at 3.  In arguing for dismissal, JMH maintains that

TCC admitted in its complaint that JMH fulfilled all of its obligations under the contract.

Additionally, JMH denies the admissibility of any extrinsic evidence because the contract

was integrated, arguing that even if extrinsic evidence were to be considered, the evidence

that TCC seeks to include contradicts and adds terms rather than explaining existing terms.

TCC instead alleges that the parties "understood when they entered into the Services

Agreements that, absent good cause for early termination, the Services Agreements would

remain in effect at least until their expressly delineated termination dates."  Pl.'s Opp. to Def. JMH's Mot. to Dismiss at 2.  As a legal matter, TCC argues that the written contract was silent as to the acceptable grounds for termination, that the proper interpretation of the contracts requires good cause for termination, and that extrinsic evidence of the parties' intent must be admitted to show that good cause was required.  TCC alleges that JMH committed breach by terminating the contract without valid justification or good cause and by using another transcription services provider instead of TCC, and furthermore breached the implied covenants of good faith and fair dealing through these actions.

**A. Breach of Contract**

California contract law controls the contract issues in this case.  *Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1083 (9th Cir. 1999).  "The construction of a contract, unless it turns on disputed facts, is a question of law."  *Armstrong Petroleum Corp v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388 (2004).  The elements of a breach of contract suit in California are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Id.* at 1391 n.6.  Breach is the wrongful failure to perform a contract.

In order to determine whether breach occurred, the Court must first determine what were the precise terms of the contract at issue.  Under California Civil Code § 1625, "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."  However, at times courts will supplement the written text of a contract with extrinsic evidence of additional or differing terms.  "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

The California Courts of Appeal and the Ninth Circuit in applying California law have a split of authority as to "whether a provision in an employment contract providing for termination 'at any time' or upon specified notice is, without more, reasonably susceptible to an interpretation allowing for the existence of an implied-in-fact agreement that termination will occur only for cause," which the California Supreme Court has resolved. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 389 (2006). Although the contract in question in this case is not an employment contract, both parties rely on this line of cases for authority. The Court likewise finds the rationale of the California Supreme Court regarding employment contracts to be sufficiently analogous to guide the Court's interpretation of the contract at question.

In *Dore*, the California Supreme Court reviewed the series of cases that address the issue of whether a contract specifying that termination may occur either at any time or on specified notice is potentially ambiguous or is silent at to whether cause is required, such that extrinsic evidence may be introduced. The Supreme Court rejected the holdings of the courts of appeal in several cases, and that of the Ninth Circuit in *Sherman v. Mutual Benefit Life Insurance Co.*, 633 F.2d 782, 784 (9th Cir. 1980), where the courts improperly concluded that such a contract "could reasonably be interpreted as consistent with an implied requirement of good cause for termination." *Dore*, 39 Cal. 4th at 390. Instead, the California Supreme Court embraced the holding of the Court of Appeal that "a contract which provides that it may be terminated on specified notice cannot reasonably be interpreted to require good cause as well as notice for termination, unless extrinsic evidence establishes that the parties used the words in some *special sense*. Instead, such a contract allows termination with or without good cause." *Id.* at 390-91 (citing with approval *Bionghi v. Metro. Water Dist.*, 70 Cal. App. 4th 1358, 1369 (1999) (italics added in *Dore*). Thus, the Supreme Court disagreed with the assertion "that the verbal formulation 'at any time' in the termination clause of an employment contract is per se ambiguous merely because it does not expressly speak to whether cause is required. As a matter of simple logic, rather, such a formulation ordinarily entails the notion of 'with or without cause.'" *Id.* at 391.

Although the Supreme Court's holding was articulated regarding the phrase "at any time," its consideration of precedent cases that also address contracts terminable upon specified notice leaves little room to doubt that its holding extends as far as the language in the present contract.  Thus, California law is clear that the formulation "by giving the other party 90 days written notice" is not per se ambiguous because it is silent on whether cause is required, and that as a matter of simple logic, this formulation ordinarily entails the notion of with or without cause.

Yet the Supreme Court did not end its consideration of this topic there.  That the phrasing of the specific contractual clause itself was unambiguous with respect to cause for termination of the contract did "not preclude the possibility that the [contract], when considered as a whole, contains ambiguity on the topic."  *Id.* at 391.  The Court then looked back to the *Pacific Gas* test, that extrinsic evidence may be admitted if "relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  69 Cal. 2d at 37.  The Court concluded that the contract's discussion of additional employee reviews and assessments did not confer a for-cause term on the contract, and that the inclusion of a definition of at-will employment did not "introduce ambiguity rendering the letter susceptible of being interpreted as allowing for an implied agreement that [plaintiff] could be terminated only for cause."  *Dore*, 39 Cal. 4th at 392.  As a result, the Court found that the contract in question contained no ambiguity in its termination provision, and that as a result, there were no triable issues of fact with respect to the causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.  *Id.* at 393.

Here, TCC asks the Court to conclude that the contract on the whole is reasonably susceptible to an interpretation that the contract's silence as to acceptable terms of termination on 90 days' notice confers a for-cause term on the contract, in light of precedent cases where such a finding was reached.  *See Esbensen v. Userware Int'l, Inc.*, 11 Cal. App. 4th 631, 636 (1992); *Sherman,* 633 F.2d at 784.  *Dore* casts serious doubt on the continued validity of the holdings in those cases.  Furthermore, under *Dore*, the Court's task is to assess whether the contract as a whole was so ambiguous as to be susceptible of such an

interpretation. *See* 39 Cal. 4th at 391-92. Here, the contract is unambiguous. The clause in question permitted either party to terminate the contract "by giving the other party 90 days written notice." A separate term articulated a process for notice-and-cure, and termination upon failure to cure. This notice-and-cure clause was utterly distinct from the 90-day notice clause, and offered the opportunity to terminate the contract on shorter notice in cases of defects in performance. Contrary to TCC's assertions, these clauses are completely consistent and unambiguous. Thirty days' notice is required to terminate after a failure to cure; ninety days' notice is required without cause. Accordingly, there is no ambiguity in the contract that would justify reliance on extrinsic evidence. JMH exercised its clear contractual rights in terminating the contract and is not liable for breach.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

TCC's cause of action against JMH additionally includes a claim for breach of the implied covenant of good faith and fair dealing, which TCC alleges that JMH breached by terminating the contracts without justification or cause.

> The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*. The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

*Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 349-50 (2000) (internal citations and quotation marks omitted, emphasis original to *Guz*). Because here, the contract is not susceptible to an interpretation that reads in a clause permitting termination only for cause, it necessarily follows that termination pursuant to the express terms of the contract cannot qualify as a violation of the implied covenants. TCC's first cause of action thus cannot succeed on this theory either.

**C. Conclusion**

As these defects in TCC's pleading of its first cause of action are resolved as matters of law upon construction of the contract in question, there are no additional facts that TCC

1  could plead as remedy.  Accordingly, JMH's motion to dismiss is GRANTED, and TCC's

2  first cause of action is DISMISSED with prejudice.

3  **II. Motion to Dismiss of Focus, Nuance, and eScription**

4         TCC brought three causes of action against Defendants Focus, Nuance, and

5  eScription: intentional interference with contractual relations, intentional interference with

6  prospective economic advantage, and civil RICO.  Focus, Nuance, and eScription move the

7  Court to dismiss the three causes of action against them, asserting that:  1) TCC's second

8  cause of action fails because TCC and JMH had an at-will contract; 2) TCC's second and

9  third causes of action should be dismissed for failure to properly plead the elements; 3)

10 TCC's second and third causes of action against Nuance should be dismissed for failure to

11 allege intentional interference against Nuance; 4) TCC's third cause of action should be

12 dismissed for failure to properly plead the elements; 5) TCC's RICO claim should be

13 dismissed because TCC has failed to allege proximate cause and because its FAC fails to

14 meet the applicable pleading standards; and 6) TCC's RICO claim against Nuance should be

15 dismissed for failure to state a claim.  The Court will address arguments regarding these three

16 causes of action in turn.

17 **A. Intentional Interference With Contractual Relations Claim**

18        Defendants Focus, Nuance, and eScription argue that because the contract between

19 TCC and JMH was an at-will contract, any reliance TCC placed on the contract was a mere

20 expectancy.  TCC asserts that as the contracts between TCC and JMH were term agreements

21 with clear end dates, they were not at-will contracts; they also claim that California law

22 declares that contracts are at the will of the parties, not of persons outside the contract.

23        The tort of intentional interference with contract is closely related to the tort of

24 intentional interference with prospective economic advantage; the two torts share almost all

25 elements and are frequently raised in the same cases.  This relationship is not purely based on

26 the overlap of elements; "[m]any cases have treated claims of interference with voidable and

27 terminable contracts as coming within the cause of action for interference with prospective

28 advantage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1128 n.4 (1990)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

(collecting cases, and declining to resolve the issue).  In *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148-52 (2004), the California Supreme Court discussed an array of cases that considered a related question of whether an at-will contract can be the source of a claim of intentional interference with contract.  The primary question before the California Supreme Court in *Reeves* was whether "an employer may recover for interference with the employment contracts of its at-will employees by a third party when the third party does not show that its conduct in hiring the employees was justifiable or legitimate." *Id.* at 1148.  Although the issue in question in this case is more general than that presented in *Reeves*, as this case does not focus on employment contracts or on the legitimacy of third-party conduct, the careful, detailed analysis of the relationship between competitive behavior and the at-will contract that the California Supreme Court offers there is instructive in this case as well.

In weighing these issues, the court first noted that "in California, the law is settled that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract" and that this tort may be predicated upon interference with an at-will contract, including an at-will employment relationship. *Id.* at 1148, 1148-49.  Despite the availability of this kind of tort liability, because public policy favors competition, "certain competitive conduct is nonactionable when it interferes with the at-will contract relations of another." *Id.* at 1149.  Prior California cases observed that advertising, price-cutting, and hiring employees of another are typically not torts. *Id.*  Although these precedent cases did not focus on at-will employment contracts, the California Supreme Court concluded that the same considerations apply to at-will employment contracts. *Id.* at 1151.  The court then observed that "the economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." *Id.*  It is worth quoting the court's rationale at length:

> But as the Restatement Second of Torts explains, if a party to a contract with
> the plaintiff is free to terminate the contractual relation when he chooses, "there
> is still a subsisting contract relation; but any interference with it that induces its
> termination is primarily an interference with the future relation between the
> parties, and the plaintiff has no legal assurance of them.  As for the future
> hopes he has no legal right but only an expectancy; and when the contract is
> terminated by the choice of [a contracting party] there is no breach of it.  The

1  competitor is therefore free, for his own competitive advantage, to obtain the
2  future benefits for himself by causing the termination. Thus, he may offer
   better contract terms, as by offering an employee of the plaintiff more money to
   work for him or by offering a seller higher prices for goods, and he may make
3  use of persuasion or other suitable means, all without liability." (Rest.2d Torts,
   § 768, com. I.)  Under this analysis, an interference with an at-will contract
4  properly is viewed as an interference with a prospective economic advantage, a
   tort that similarly compensates for the loss of an advantageous economic
5  relationship but does not require the existence of a legally binding contract.

6  *Id.* at 1151-52 (footnote omitted, alteration in the original).

7          The Court finds this rationale persuasive in the instant matter as well.  As the Court

8  has already concluded that the contract between TCC and JMH functioned as a contract

9  terminable upon notice, either party was free to terminate the contractual relationship at any

10 time upon provision of proper notice.  In such a situation, taking TCC's pleadings on their

11 face, any interference from Nuance, Focus, or eScription did not interfere in the contract but

12 in the anticipated future benefit of that contract.  Although TCC and JMH clearly had a

13 contract, because it was terminable upon notice, any interference with the relationship

14 between TCC and JMH is more properly viewed as interference with prospective economic

15 advantage, not the contract itself.  Accordingly, since the contract between TCC and JMH

16 was terminable upon notice, a claim for interference with the contract is improper as a matter

17 of law; TCC's second cause of action for intentional interference with contractual relations is

18 hereby dismissed with prejudice.[1]

19 **B. Plaintiff's Intentional Interference With Prospective Economic Advantage Claim**

20         Defendants Focus, Nuance, and eScription assert that TCC's third cause of action for

21 intentional interference with prospective economic advantage is defective for a variety of

22 reasons and should be dismissed.  First, Defendants claim that there are no intentional

23 interference claims pleaded against Nuance, so the third cause of action should be dismissed

24 for failure to state a claim.  Second, Defendants claim that TCC's first amended complaint

25

26

27         [1]Notably, Judge Armstrong reached the same conclusion on consideration of this
   issue.  *See Lovesy v. Armed Forces Benefit Ass'n*, 2008 WL 696991, at *11 (N.D. Cal. 2008)
   ("[A]s a matter of law, a claim for interference with contract is improper if the contract is 'at-
28 will.'").

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   inadequately alleges the elements of intentional interference with prospective economic

2   advantage.

3       "To state a claim for intentional interference with economic advantage, plaintiff must

4   allege: 1) an existing economic relationship or one 'containing the probability of future

5   economic benefit'; 2) knowledge by the defendant of the relationship; 3) acts by defendant

6   designed to disrupt the relationship; 4) actual disruption of the relationship; 5) damages

7   proximately caused by the acts of the defendant." *Accuimage Diagnostics Corp. v.*

8   *Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (citing *Della Penna v. Toyota*

9   *Motor Sales, U.S.A.*, 11 Cal. 4th 376, 380 n.1 & 392-93 (1995)).  The California Supreme

10  Court has added what functions as a sixth element that "the act must be 'wrongful by some

11  legal measure other than the fact of interference itself.'"  *Id.* (citing *Della Penna*, 11 Cal. 4th

12  at 393).  "Thus, it is 'plaintiff['s] burden to prove, as an element of the cause of action itself,

13  that the defendant['s] conduct was independently wrongful.'"  *Id.* (citing *Bed, Bath & Beyond*

14  *of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 881 (1997))

15  (alterations added in *Accuimage*).

16      Defendants assert that the third cause of action should be dismissed as against Nuance

17  because TCC makes no allegation that Nuance interfered with TCC's relationship with JMH,

18  since Nuance did not acquire Focus and eScription until after the occurrence of the facts on

19  which this case is based.  TCC argues that as Nuance is successor-in-interest to claims

20  against Focus and eScription, naming Nuance causes no prejudice.  While there may be no

21  prejudice, "[i]t is a general principle of corporate law deeply ingrained in our economic and

22  legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."

23  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal citation and quotation marks

24  omitted).  In the absence of specific allegations of interference by Nuance, the third cause of

25  action as brought against Nuance is dismissed without prejudice.

26      The first element of intentional interference with prospective economic advantage is

27  "an existing economic relationship or one 'containing the probability of future economic

28  benefit.'"  *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956 (citing *Della Penna*, 11 Cal.

United States District Court
For the Northern District of California

4th at 392-93).  Defendants claim that TCC failed to allege facts showing a reasonable

probability of future economic benefit.  California state law requires "proof that it is

reasonably *probable* that the lost economic advantage would have been realized but for the

defendant's interference."  *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987) (emphasis in the

original).  By merit of demonstrating the existence of a contract between TCC and JMH,

even one with a termination-on-notice clause, TCC has shown that there was a reasonable

probability of future economic benefit from its relationship with JMH.  *See* FAC, Ex. A and

B.  TCC has pleaded a claim that is plausible on its face under the standard of *Twombly*.  *See*

127 S. Ct. at 1974.  Although Defendants have sought to poke holes in TCC's allegations,

construing the facts in the light most favorable to Plaintiff, as the Court must on a motion to

dismiss, it is clear that Plaintiff's complaint adequately pleads the first element.

      The plaintiff in a suit for intentional interference with prospective economic

advantage must also plead the second element, knowledge by the defendant of the

relationship with which the interference occurred.  *Accuimage Diagnostics Corp.*, 260 F.

Supp. 2d at 956.  Defendants contend that TCC has failed to plead facts showing that Focus

had knowledge of the relationship between TCC and JMH, thereby inadequately pleading the

second element with regard to Defendant Focus.  The California Court of Appeal has stated

that it is "not persuaded knowledge of the injured party's specific identity or name is a

prerequisite to recovery for [intentional interference with prospective economic advantage]."

*Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1133 (1986).

On consideration of this element as related to intentional interference with contract, the Ninth

Circuit has similarly stated that "[w]hen the defendant performs the act that causes the

interference, the defendant need not know exactly who is a party to the contract, so long as

he knows he is interfering with a contractual relationship."  *Altera Corp. v. Clear Logic, Inc.*,

424 F.3d 1079, 1092 (9th Cir. 2005) (observing that the Second Restatement of Torts, section

766, comment p states that "the person inducing a breach must be aware that there is a

contract, but need not know the specific parties to the contract").  *See also Sebastian Int'l,*

*Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001) ("This Court agrees that in

order to satisfy the second element of this tort under California law, the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted.") Thus, since the FAC states that Focus "is, and at all relevant times was, aware that JMH had a contractual relationship with TCC, or, at least, was aware that JMH had a contractual relationship with a party other than Focus," TCC's pleading is adequate as to the second element.  FAC at ¶ 71.

To survive a motion to dismiss, the plaintiff alleging intentional interference with prospective economic advantage must plead "acts by defendant designed to disrupt the relationship." *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956.  Defendants argue that TCC failed to allege that eScription and Focus had a substantial certainty that their actions would disrupt TCC's contract with JMH, thereby inadequately pleading the third element of intentional interference with prospective economic advantage.  California law clearly establishes an intent requirement for this element.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (reciting the third element as "intentional acts on the part of the defendant designed to disrupt the relationship").  Substantial certainty is not a pleading requirement, but is an alternative to pleading intent: "While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Id.* at 1154.  TCC clearly has met this standard.  In its first amended complaint, TCC alleges that eScription knowingly misrepresented the source of the cost savings available with use of the eScription software.  *See* FAC ¶¶ 41, 46, 47, 80, 82.  Likewise, TCC alleges that Focus bid a lower price than TCC bid, and misrepresented its intent to use only domestic transcriptionists.  *See id.* at ¶¶ 55-57, 81-82.  The Court finds that these are not mere conclusory allegations but are assertions of intent based on specific allegations of fact.  Assuming these facts to be true, as the Court must on a motion to dismiss, the pleading is sufficient to state a claim on which relief may be granted.

1    The plaintiff in a suit for intentional interference with prospective economic

2   advantage must also plead the fifth element, "damages proximately caused by the acts of the

3   defendant." *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956.  Defendants claim that

4   TCC's pleading failed to allege that its damages were proximately caused by the Defendants'

5   actions.  TCC has adequately pleaded proximate cause by explaining how the acts of

6   eScription and Focus interfered with the relationship that JMH had with TCC.  *See* FAC

7   ¶¶ 80-81, 83.  Assuming these allegations to be true, the Court concludes that TCC's

8   pleading is sufficient.

9    Finally, Defendants also assert that TCC failed to allege that their "interference was

10   wrongful by some measure beyond the fact of the interference itself." *Della Penna*, 11 Cal.

11   4th at 393 (internal citation and quotation marks omitted).  "Thus, it is 'plaintiff['s] burden to

12   prove, as an element of the cause of action itself, that the defendant['s] conduct was

13   independently wrongful.'" *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956 (citing *Bed,*

14   *Bath & Beyond of La Jolla*, 52 Cal. App. 4th at 881.  As TCC's first amended complaint is

15   replete with allegations that Focus and eScription engaged in acts of fraudulent

16   misrepresentation, *see* FAC ¶¶ 41-42, 46-48, 55-57, 80-82, 96-98, an independently wrongful

17   act, the pleading is sufficient.  Accordingly, Defendants' motion to dismiss is DENIED as to

18   the third cause of action against Focus and eScription.

19   **C. Plaintiff's RICO Claim**

20    Defendants Focus, Nuance, and eScription ask the Court to dismiss TCC's fourth

21   cause of action for violation of 18 U.S.C. § 1962(c), civil RICO.  They argue that TCC's

22   RICO claim should be dismissed because the Plaintiff has failed to allege proximate cause;

23   because its FAC fails to meet the heightened pleading standard for fraud cases; and because

24   it fails to state a claim against Nuance.  The Court will address these three arguments in turn.

25    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated

26   with any enterprise engaged in, or the activities of which affect, interstate or foreign

27   commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

28   affairs through a pattern of racketeering activity or collection of unlawful debt."

United States District Court

For the Northern District of California

1    Defendants argue that TCC has failed to allege proximate cause under RICO because

2  their pleading does not comport with Ninth Circuit requirements under *Mendoza v. Zirkle*

3  *Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002).  There, the Ninth Circuit declared that three non-

4  exhaustive factors should be analyzed to determine whether an "injury is 'too remote' to

5  allow recovery: (1) whether there are more direct victims of the alleged wrongful conduct

6  who can be counted on to vindicate the law as private attorneys general; (2) whether it will

7  be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's

8  wrongful conduct; and (3) whether the courts will have to adopt complicated rules

9  apportioning damages to obviate the risk of multiple recoveries."  *Id.* at 1169 (interpreting

10  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)).  Defendants argue that because

11  JMH can vindicate any wrongdoing and because attributing damages will be impossible,

12  proximate cause is inadequate.  However, in *Mendoza*, the Ninth Circuit concluded that there

13  was proximate cause between a scheme of hiring undocumented workers and the depression

14  of agricultural wages paid to local, documented immigrant workers.  *Id.* at 1166, 1170.  Since

15  the undocumented workers could not "be counted on to bring suit for the law's vindication"

16  the documented workers were able to bring suit.  *Id.* at 1170.  Likewise, the Ninth Circuit

17  "distinguish[ed] between uncertainty in the fact of damage and in the amount of damage," *id.*

18  at 1171; the court concluded that the possibility of intervening factors did not signify the

19  absence of a relationship between the alleged actions and the claimed injury, or that the case

20  should have been dismissed on a Rule 12(b)(6) motion.  *Id.* at 1170-71.

21    These factors are directly applicable to the instant situation.  Here, just as the

22  undocumented workers could not be enlisted as private attorneys general, so too is it unlikely

23  that JMH would perform these tasks, since the benefits of Defendants' fraudulent

24  misrepresentations also accrued to JMH, which received lower-priced transcription services

25  as a result of its relationship with the other Defendants.  It is therefore unreasonable to think

26  that JMH is appropriately positioned to vindicate the law as private attorneys general.

27  Likewise, although Defendants have asserted an array of intervening factors and argue that it

28  will be difficult to attribute damages, this is not a defect in pleading under *Mendoza*.

United States District Court

For the Northern District of California

1        A recent Supreme Court case on RICO, *Bridge v. Phoenix Bond & Indemnity Co.*,

2   presents a similarly analogous situation.  128 S.Ct. 2131 (2008).   Although *Bridge* focused

3   primarily on whether reliance is an element of civil RICO claims, its analysis is instructive in

4   the present matter.  There, the plaintiff and defendant were regular participants in tax sales.

5   *Id.* at 2135.  Tax sales in their county often resulted in a tie between multiple bidders, which

6   the county resolved by allocating the property on a rotational basis to ensure fair

7   apportionment; for this rule to work, the county required each entity to bid only once on any

8   individual property.   *Id.*  Plaintiff brought suit under RICO, claiming that defendant

9   fraudulently gamed the system, contrary to the rules of the tax sales, by organizing groups to

10   bid collusively on behalf of one business, thereby obtaining a greater number of liens than it

11   otherwise would have obtained.   *Id.* at 2136.  Although proximate cause was not the central

12   inquiry of *Bridge*, the Court approvingly applied the direct relation test of proximate cause,

13   which requires a "direct relation between the injury asserted and the injurious conduct

14   alleged," and found no defect.  *Id.* at 2142.  Further, the Supreme Court clarified that

15   "plaintiffs can recover in a variety of circumstances where, as here, their injuries result

16   directly from the defendant's fraudulent misrepresentations to a third party."  *Bridge*, 128

17   S.Ct. at 2141.  Just as in *Bridge*, TCC may be able to recover for the injuries it alleges

18   resulted from Defendants' fraudulent misrepresentations to JMH; whether such injuries

19   occurred is inappropriate for resolution on a motion to dismiss.

20        Defendants further argue that TCC's complaint was inadequately pleaded because it

21   lacked the particularity required by Fed. R. Civ. P. 9(b).  Although the standard rule in the

22   Ninth Circuit is that a complaint alleging fraud "must specify such facts as the times, dates,

23   places, benefits received, and other details of the alleged fraudulent activity," the Ninth

24   Circuit has also "held that the general rule that allegations of fraud based on information and

25   belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing

26   party's knowledge.  In such situations, plaintiffs can not be expected to have personal

27   knowledge of the relevant facts."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

28   This latter situation is present in the instant matter.  TCC has alleged the circumstances of the

United States District Court

For the Northern District of California

1    fraudulent communications that it claims eScription and Focus made.  Although it has not

2    specified the time and person details, TCC has alleged the content of the communications it

3    claims were fraudulent, the benefits it argues eScription and Focus received, and the general

4    timing of these communications.  *See* FAC ¶¶ 41-42, 46-48, 55-57, 80-82, 96-98.  Because

5    eScription and Focus have knowledge of what content TCC alleges to be fraudulent, the

6    purpose of Rule 9(b), which "ensures that allegations of fraud are specific enough to give

7    defendants notice of the particular misconduct which is alleged to constitute the fraud

8    charged so that they can defend against the charge and not just deny that they have done

9    anything wrong," is fulfilled here.  *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

10   Accordingly, TCC's complaint adequately pleads the RICO claim as against eScription and

11   Focus.

12        The same cannot be said for the allegations TCC made against Nuance.  Defendants

13   argue that Nuance is not properly named as a defendant in the fourth cause of action for

14   RICO as there is no specific conduct attributed to Nuance.  Further, as heightened pleading

15   standards apply to allegations of fraud, without alleging some specific conduct against

16   Nuance, even if this standard were relaxed pursuant to *Neubronner*, the pleading is defective

17   as to this Defendant.  *See Moore v. Kayport Package Express., Inc.*, 885 F.2d 531, 541 (9th

18   Cir. 1989) (affirming dismissal where complaint did "not attribute specific conduct to

19   individual defendants").  Also, although the Ninth Circuit has "concluded that a plaintiff is

20   free to name all members of an association-in-fact enterprise as individual defendants," *River*

21   *City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992),

22   Plaintiff has failed to allege an association-in-fact enterprise, which requires pleading "an

23   ongoing organization, formal or informal," and "that the various associates function as a

24   continuing unit."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007).  In the

25   absence of any specific allegation of conduct against Nuance that would put Nuance on

26   adequate notice to defend against the charge, the RICO claim against Nuance is dismissed

27   without prejudice.

28

**United States District Court**
For the Northern District of California

1  **CONCLUSION**

2      For the foregoing reasons, Transcription Communications Corporation's first cause of

3  action against John Muir Health for breach of contract and breach of the implied covenant of

4  good faith and fair dealing is DISMISSED with prejudice, as these defects in TCC's pleading

5  are legal, not factual, and thus cannot be remedied by amendment.  John Muir Health's

6  motion to dismiss is hereby GRANTED.

7      For the foregoing reasons, the motion to dismiss of Defendants Nuance, eScription,

8  and Focus is GRANTED IN PART and DENIED IN PART.  Transcription Communications

9  Corporation's second cause of action for intentional interference with contractual relations is

10 DISMISSED with prejudice, as its defects are legal and cannot be remedied through

11 amendment.  The third cause of action for intentional interference with prospective economic

12 advantage and fourth cause of action for violation of RICO are DISMISSED without

13 prejudice as against Defendant Nuance; the third and fourth causes of action shall stand as

14 brought against Defendants Focus and eScription.

15

16      **IT IS SO ORDERED.**

17

18 Dated: March 13, 2009                                _____

19                                                      Thelton E. Henderson
                                                        United States District Judge
20

21

22

23

24

25

26

27

28

21